UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

ROBERT A. FERNANDEZ,               )
                                   )
            Plaintiff,             )
                                   )
v.                                 )          Case No. 4:19-cv-01638-SNLJ
                                   )
ST. LOUIS COUNTY, Mo.,             )
                                   )
            Defendant.             )

**Plaintiff's Trial Brief of the Solicitor License, Damages, and Attorney's Fees**

Plaintiff Robert A. Fernandez, by counsel W. Bevis Schock and Hugh A. Eastwood, states as follows for his Brief of the Solicitor License, Damages, and Attorney's Fees, submitted pursuant to the Court's Case Management Order [21], as amended, and the Court's Order for Stipulated Record and Briefs [54]:

I.    **Introduction**

This case is about the First Amendment rights of a homeless beggar to solicit alms from stopped motorists while standing on the sidewalk median of a County roadway.  Plaintiff Robert A. Fernandez seeks to enjoin three County ordinances under which since 2017 he has been cited 64 times and arrested four times; he seeks damages under Section 1983 for those citations and arrests under both First and Fourth Amendment claims; and he seeks damages for malicious prosecution under Missouri state law for those occurrences.

The Court has already permanently enjoined one of the three (Vagrancy) [22]; and indicated to the parties that it is inclined to permanently enjoin a second (Roadway Solicitation). The County does not appear to challenge the injunction of the Roadway Solicitation Ordinance.

Before the court issued its order for stipulated record and briefs [54], Fernandez submitted a trial brief [53] on the Solicitor license ordinances as codified at Section 804.050. This brief restates and supplements that briefing, and also discusses Fernandez's damages and his attorney's fees.

Fernandez stands on his prior briefing as to the Roadway Solicitation ordinance.

II.    **Brief Factual Summary, Claims and Procedural History**

Since 2017, Fernandez has been cited approximately 64 times under the challenged ordinances, and faced four arrests (with 29 hours, 2 minutes of total seizure) for his constitutionally-protected solicitation speech.  24 of the citations and 12 hours, 30 minutes of the seizures occurred during the pendency of this Section 1983 lawsuit, which was filed on June 5, 2019.  Fernandez was forced to defend himself in the County's municipal court (South Division), but the County has either entered *nolle prosequi* on the citations or Fernandez has had First Amendment-based motions to dismiss granted by that municipal court.  The date of Plaintiff's last arrest was August 22, 2019, long before the known spread of the COVID-19 global pandemic to the St. Louis region in March 2020.[1]

Fernandez's complaint made claims for damages based on Fourth Amendment seizure (Count IV), First Amendment chilling (Count V), and Missouri state law malicious prosecution (County VI).

After filing his Complaint, Fernandez moved for a preliminary injunction [3], and the Court determined it would be best to consolidate that motion with the trial on the merits as to a permanent injunction and damages.

---

[1] *See* County's COVID-19 response website at https://stlcorona.com (last accessed Aug. 31, 2020).

The Court has already granted Count III of plaintiff's Complaint and enjoined [22] a challenged vagrancy ordinance under which Fernandez was also cited, St. Louis County Code Sections 716.080 and .090.

The Court has suggested in telephone conference that based on prior briefing it will likely grant Count II of plaintiff's Complaint, and enjoin the roadway solicitation ordinance, Code Section 1209.090.  The County has conceded that relief, and thus Plaintiff, as stated above, does not re-brief that issue here.

This brief thus focuses solely on the Solicitor License ordinance, Fernandez's damages, and his attorney's fees and costs under Section 1988.

III.  **Discussion of the Solicitor License**

The Solicitor license ordinances are codified at Section 804.050 *et seq.,* which is a content-based regulation of only one form of speech ("solicitation").[2]  It is impermissibly underinclusive on its face and as applied by exempting certain speakers.  A speaker who addresses motorists about politics or the theater, or who asks for directions, for example, is unregulated.  In this respect it faces the same infirmities as the Roadway Solicitation ordinance, which the parties anticipate will be enjoined.

The content-based nature of the prohibition is itself sufficient grounds to invalidate the Solicitor license.  *See, e.g., Thayer v. City of Worcester,* 144 F. Supp. 3d 218 (D. Mass. 2015), *preliminary injunction entered upon G/V/R,* 135 S.Ct. 2218; *Rodgers v. Bryant,* 942 F.3d 451, 456 (8th Cir. 2019); *Clatterbuck v. City of Charlottesville,* 708 F.3d 549, 556 (4th Cir. 2013).

---

[2] Fernandez does not engage in commercial speech, and is not challenging the Peddler's section of the County code.

3

As Fernandez has already briefed this court [Docs. # 3-1, 14, 23, 25], as a threshold matter the speech can be regulated only by reference to its content.  A police officer enforcing the Solicitor license must first inquire into the content of the speech itself in order to determine whether a license is required.  As such, a content-neutral analysis is inappropriate here.  *Cf. Ward v. Rock Against Racism,* 491 U.S. 781, 791 (1989).

In *Reed v. Town of Gilbert, Ariz.,* 135 S.Ct. 2218 (2015), a sign regulation case, the Supreme Court clarified the distinction between content-based and content-neutral restrictions on speech, holding that a restriction is content based if it draws *any* facial distinction based on the message of the speaker.

Chapter 804 does not require an individual to obtain a license in order to be "positioned .. near … public ways" or "located .. near the roadway" to protest the government, to evangelize for Jesus, to promote a free Shakespeare festival, to encourage enrollment in a charter school, to solicit navigation directions from a motorist, to perform a song or recite a soliloquy—indeed speech or expressive conduct on any manner of subjects that does not involve "soliciting property or financial assistance of any kind" or other types of sales.  Thus, the licensing requirement is triggered only by certain subjects of speech, and a police officer enforcing the above licensing requirement would necessarily need to inquire into the subject matter of the speech to determine whether or not a license is required.

Fernandez alleges that he goes to public areas, holds his sign, and speaks for alms. Asking for charity or gifts, whether "on the street or door to door," is protected First Amendment speech.  *Rodgers v. Bryant,* 942 F.3d 451 (8th Cir. 2019).

Nor is this a leafleting case.  As Judge Baker already observed in the City of Desloge case involving the KKK, distribution regulations are reasonable if they are content neutral, as an

4

officer enforcing a leafleting ordinance need not evaluate the content of the speech being distributed to determine whether a violation has occurred.  *See* Memorandum and Order, *Trad. Am. Knights of the Ku Klux Klan v. City of Desloge,* No. 4:13-cv-00810-NAB at *9 [Doc #100, 2/23/2016].

As the Eighth Circuit observed, simply because there are limits on the time, place or manner of speech does not transform a content-based law into a content-neutral one.  Rather, because the law targets only a subset of the speech that meets these criteria—specifically, asking for charity or a gift—it is a content-based restriction.  *Rodgers,* 942 F.3d at 356, relying on *Reed,* 135 S.Ct. at 2227; *see also R.A.V. v. City of St. Paul,* 505 U.S. 377, 391 (1992).

### a.  Trafficway Safety and Efficiency Interests

The Court has expressed interest [42 at p. 9] in additional briefing on the relationship (or lack thereof) between the license and the County's stated interest in trafficway safety and efficiency interests.  Accordingly, Fernandez will address the lack of evidence for such government interests in the record, the lack of narrow tailoring, and the procedural failure of the County to muster any expert evidence on a timely basis.

The Solicitor license ordinance as codified in Chapter 804 is silent on the relationship between the license and the government's asserted interests.  At least one appellate court, the Fourth Circuit, has expressed frustration in a solicitation challenge where  "[t]he Ordinance does not contain a statement of purpose, and no evidence is properly before us to indicate the City's reason or reasons for enacting the Ordinance." *Clatterbuck*, 708 F.3d 549, 558 (4th Cir. 2013).

Other courts have found that even where—unlike here—an ordinance has elaborate references in a "Whereas" clause to traffic safety concerns, nevertheless the targeting of panhandler or beggar interactions with motorists (even if not explicitly by name) is

5

unconstitutional for lack of narrow tailoring.  *See, e.g., Martin v. City of Albuquerque,* No. CIV 18-0031 RB/JFR (D.N.M. July 18, 2019) (holding such regulations not to be narrowly tailored as to a traditional public fora).  Fernandez notes that the *Martin* court held at \*13 that medians and sidewalks were the traditional public fora for such speech, and distinguished them from standing in the roadway, or vehicle "travel lanes."  That distinction supports Fernandez's desire to beg from a triangular median adjacent to the travel lanes.  Yes, Fernandez may briefly step into the curbside or shoulder of the roadway when the light is red to complete his receipt of a donation of money or things from a motorist.  But even that nuance is approved of by *Martin*.  *Id.* at 1023 ("Vehicles may sometimes pull over onto a shoulder, but shoulders, medians, and sidewalks are certainly not dedicated to constant moving vehicle traffic.").  Furthermore, Fernandez is <u>not</u> asking this Court to extend novel protections to his ability to meander through the travel lanes within the roadway.

The wide sidewalk median area where Fernandez engages in unlicensed solicitation is akin to the area approved of by the Tenth Circuit case cited by the Court [42 at p. 7]: "A mere ten feet away from where he was cited, the median is wider than 36 inches and is therefore unaffected by the Ordinance. We simply cannot accept this ten-foot difference on the same median as a substantial burden on speech. In compliance with the Ordinance, Evans can stand on wide, paved medians to communicate effectively with his target audience." *Evans v. Sandy City,* 944 F.3d 847, 857 (10th Cir. 2019).

As a threshold matter, the County has not shown that any asserted interests in traffic safety and efficiency are compelling.  "Asserted interests in traffic safety and aesthetics, while significant, have never been held to be compelling." *Neighborhood Enterprises, Inc. v. City of*

*St. Louis,* 644 F.3d 728, 736 (8th Cir. 2011); *Whitton v. City of Gladstone,* 54 F.3d 1400, 1407 (8th Cir. 1995) (quoting *Burson v. Freeman,* 504 U.S. 191, 211 (1992)).

The County's designation of certain high-traffic-volume intersections is not a compelling interest.  Even if it were, there is no sound legislative basis for permitting solicitation three days a year near certain intersections as provided for in Section 804.165.2 and Schedule I.  Nor is there a sound basis for allowing some speakers to stand near on the roadway to solicit, but not others.  Either the solicitation is inherently unsafe, or it is safe.  That the County permits some solicitation for three days a year undercuts its rationale that solicitation is dangerous and must be otherwise prohibited at such places.

Even if the court were to assume the County's interests in safety and efficiency were compelling, the County has not shown that the regulation is narrowly tailored.  The County's licensing scheme leaves significant influences on the interests unregulated.  *Rodgers,* 942 F.3d at 457.  Here, myriad forms of speech are unlicensed but can equally cause dangers to traffic safety at that same location.  Moreover, the County has offered no justification for its decision to single out charitable solicitation in the form of begging from other types of speech, including licensed charities asking for money, and so its licensing system is underinclusive.  *See Reed,* 135 S. Ct. at 2231-32; *Brown v. Entm't Merchs. Ass'n,* 564 U.S. 786, 801-02 (2011); *Johnson v. Minneapolis Park & Recreation Bd.,* 729 F.3d 1094, 1100-01 (8th Cir. 2013); *see also Rodgers v. Bryant,* 942 F.3d 451 (8th Cir. 2019).

The Schedule I restrictions on intersections are also geographically over-inclusive and not narrowly tailored in that they prohibit begging at intersection locations where there is an "absence of evidence supporting the existence of a threat to public safety and traffic flow." *Cutting v. City of Portland,* 802 F.3d 79, 90 (1st Cir. 2015). Further, if the County had certain

7

compelling concerns about the manner of solicitation, it could address that through less restrictive measures.

Other courts have looked askance at traffic safety rationales.  The *Clatterbuck* district court, upon remand from the Fourth Circuit, was skeptical that 50-foot buffer zones for panhandling away from intersections were narrowly tailored given the many number of other "distractions" near such intersections.  92 F. Supp. 3d 478, 485 (W.D. Va. 2015).  And the Eighth Circuit has held that the subjective and unpredictable reactions of motorists to protected speech are not a valid basis for such a regulation.  *Stahl v. City of St. Louis,* 687 F.3d 1038, 1042 (8th Cir. 2012) ("The ordinance criminalizes activity based primarily on often unpredictable reactions of third parties rather than directly on a person's own actions, and it excessively chills protected First Amendment activity.").

The County did not disclose any experts on this issue in its Rule 26 disclosures, nor comply with the expert report and deposition requirements of the Rule.  Therefore it is too late for the County to raise any expert opinion in the facts or briefing.  In the parties' Stipulation, the County does have a couple of its police officers improperly assert expert opinions on traffic safety.  Plaintiff objects and moves to strike those expert opinions masquerading as "facts" on procedural grounds due to lack of timely disclosure pursuant to F.R.Civ.P. 26(a)(2); *Vanderberg v. Petco Animal Supplies Stores, Inc.,* 906 F.3d 698 (8th Cir. 2018).

### b.  License as prior restraint on speech and expressive activity, overbreadth

Even under a content-neutral analysis, a license as a prior restraint on speech and expressive activity is highly suspect.  The Eighth Circuit has expressed doubt as to the connection between individuals or small groups and the governmental interest in managing public spaces.  *See, e.g., Douglas v. Brownell,* 88 F.3d 1511, 1524 (8th Cir. 1996) (expressing

8

concern about the application of a permit requirement to groups of ten persons); *Berger v. City of Seattle,* 569 F.3d 1029, 1039 (9th Cir. 2009) ("[W]e and almost every other circuit ... have refused to uphold registration requirements that apply to individual speakers or small groups in a public forum.") (citations omitted); *see also Gresham v. Peterson*, 225 F.3d 899, 905 (7th Cir. 2000) ("While some communities might wish all solicitors, beggars and advocates of various causes be vanished from the streets, the First Amendment guarantees their right to be there, deliver their pitch, and ask for support.").

The buffer in the sidewalk counseling regulation in *McCullen v. Coakley* was overbroad because it burdened petitioners' ability to reach the audience they sought to engage with, and it led them to be "far less successful" in their conversations." 134 S. Ct. 2518, 2536-37 (2014). Since the *McCullen* petitioners sought to counsel rather than merely to protest they needed to be close enough to people to speak in a conversational tone. *Id.* The same is true here. Begging is like "sidewalk counseling" because panhandlers have to be at a normal conversational distance to converse with drivers stopped at the red light in a conversational tone, unlike protesting where protestors can just holler out their message from a great distance. *Id.* Beggars need to be near suburban drivers stopped at the red light in order to ask for cash and to accept it by hand, whether silently by holding a sign, or verbally by asking for cash.

The County has the burden of providing substantial evidence that its regulations of solicitation speech does not restrict more speech than necessary, that there is evidence justifying the restrictions, and that it has tried other less restrictive ways to address the problem first. *Middleton v. Reynolds,* 779 F.3d 222, 231 (4th Cir. 2015) (enjoining ordinance banning homeless persons from standing on median to solicit money as not narrowly tailored to dangerous in-the-roadway transactions at busy intersections). Even in the *ACORN v. St. Louis County* case,

9

analyzing the separate roadway solicitation ordinance under a content-neutral analysis, the County then still allowed ACORN solicitors to distribute flyers (known as "tags") and to solicit money from cars, but just by remaining in the median and only entering the roadway to obtain cash from motorists.  726 F. Supp. 747, 753 (E.D. Mo. 1989).  The *Evans* dissent points out that an adequate record must extend beyond the mere anecdotal testimony of a government official as to their feelings.  944 F.3d at 863-64.  Fernandez does not anticipate that the County will offer anything more than anecdotes from police officers and other County officials.

It is worth noting that the statute analyzed by the Fourth Circuit in *Middleton* was content neutral, and therefore analyzed under the less taxing intermediate scrutiny analysis of time, place and manner.  *Id.* at 229.  Even under intermediate scrutiny, however, the Fourth Circuit required the county defendant to demonstrate that the statute "materially advances an important or substantial interest by redressing past harms or preventing future ones."  *Id.* at 227.  Here the County appears to reason to believe Section I intersections are safe for solicitation three days per year, but not the other 362.  Further, the County essentially concedes by the fact that countless intersections in the County are not listed on Schedule I that there are intersections which are safe for begging every day of the year.  Of course, since such intersections lack significant traffic volume, then there is little audience and presumably few-to-no donors for the alms that Fernandez seeks through his speech.  *But see Hill v. Colorado,* 530 U.S. 703, 730–31 (2000) ("The fact that the coverage of a statute is broader than the specific concern that led to its enactment [may be] of no constitutional significance."). What matters is whether the significant governmental interest addressed by the regulation is served, *id.*, and "the validity of the regulation is judged by its general effect, not whether enforcement in a particular case is necessary to protect" the asserted interest, *ACORN v. St. Louis County,* 930 F.2d at 595.

Here, there is no evidence in the Ordinances as codified that supports a *prima facia* claim by the County that an advance Solicitor license requirement for solicitation is narrowly tailored to serve a significant government interest.  *Forsyth County,* 505 U.S. at 129.  The County could also more narrowly tailor any advance Solicitor licenses, for example, requiring advance licensing only for large groups to engage in mass solicitation.  Finally, by regulating public places so comprehensively with the advance Solicitor license requirement, the County is not leaving open ample alternatives for Fernandez—or other third parties dissimilarly situated—to solicit financial assistance.

The Eighth Circuit has been wary of extending "the circumference of what this circuit has previously found constitutes a significant government interest" and limiting time-place-and-manner regulations to "unique" situations such as funerals here there is a risk of "offensive speech" causing "psychological *and* physical harm."  *Phelps–Roper v. City of Manchester,* 697 F.3d 678, 697 (8th Cir. 2012) (Smith, J., concurring); *id.* at 691 (buffer zones around abortion clinics).  Common sense suggests that a homeless beggar soliciting alms is not "offensive speech" that can cause "psychological and physical harm."  Beggars, however, are likely unpopular speakers to a citizenry that is sufficiently well-to-do to own and operate a motor vehicle. *Traditionalist Am. Knights of the Ku Klux Klan v. City of Desloge,* 775 F.3d 969, 979 (8th Cir. 2015) (Loken, J. dissenting: "[*Johnson v. Minneapolis Park & Rec. Bd.,* 729 F.3d 1094, 1098 (8th Cir. 2013)] is instructive insofar as it analyzes an assumedly content neutral ban on distribution that silenced an unpopular speaker in a traditional public forum.").

The solicitor licensing scheme and Schedule I intersections under Chapter 804 are not narrowly tailored.  There are obviously less restrictive means for the County to promote traffic

safety that are content neutral.  Nor has the County shown "that it considered different methods that other jurisdictions have found effective."  *McCullen,* 134 S. Ct. at 2539.

The Court should enjoin the Solicitor's license ordinance as a content-based prior restraint on speech that is overbroad and not narrowly tailored.

**IV.    Damages**

The parties have agreed to submit Fernandez's damages to the bench.

> In a bench trial, ascertaining the plaintiff's damages is a form of factfinding that can be set aside only if clearly erroneous.
>
> …
>
> The purpose of general compensatory damages is to make the plaintiff whole.
>
> *Lawn Managers, Inc. v. Progressive Lawn Managers, Inc.*, 959 F.3d 903, 913-914 (8th Cir. 2020).  (Citations and internal quotations omitted).

Since 2017, Fernandez has been cited approximately 64 times under the three challenged ordinances, and faced four arrests (with 29 hours, 2 minutes of total seizure) for his constitutionally-protected solicitation speech under Section 804.050.  24 of the citations and 12 hours, 30 minutes of the seizures occurred during the pendency of this Section 1983 lawsuit, which was filed on June 5, 2019.  As a result of handcuffing during one of his arrests, Fernandez's shoulder was dislocated and injured, and on that day Plaintiff had to be taken to the hospital where a physician put his shoulder back in place.  Stip. ¶ 58; Pltf. Ex. 43.  As mentioned above, all arrests were pre-COVID-19.

Fernandez asserts that at all times that the St. Louis County officers acted under color of state law and within the course and scope of their duties, since they were in uniform, on the job, and enforcing County ordinances.  There is no challenge to Plaintiff's assertion that the County's actions were taken under color of law.

Fernandez brings his claim for damages for unreasonable seizure of his person under the Fourth Amendment caused by the County's policy at Section 804.050 (Count IV), for chilling of his First Amendment-protected speech and expressive activity caused by the County's policy at Section 804.050 (Count V), and Missouri state law malicious prosecution under each of the three challenged ordinances (Count VI).

It is worth noting that Fernandez has not asserted claims against any individual County police officer or County municipal prosecutor, so there are no issues of qualified or absolute immunity in this case as to his Section 1983 claims, nor of official or sovereign immunity as to his state law claim. Nor does the County plead those defenses in its Answer [10]. Rather, Plaintiff's damages claims flow from the County's *Monell* liability as to his two federal claims, and state law as to his malicious prosecution claim.

**a. *Monell* liability**

In *Monell v. Department of Social Services,* 436 U.S. 658 (1978), the Supreme Court held that a municipality can be liable under § 1983 if an "action pursuant to official municipal policy of some nature caused a constitutional tort." *Id.* at 691. To establish municipal liability, a plaintiff must first show that one of the municipality's officers violated his federal right. *Veatch v. Bartels Lutheran Home,* 627 F.3d 1254, 1257 (8th Cir.2010) (*citing City of Los Angeles v. Heller,* 475 U.S. 796, 799 (1986)). Fernandez asserts that he has undisputedly established this element through his citations, arrests and prosecutions by County officials under Section 804.050, under each of the following two theories:

1.  Unreasonable seizure of his person under the Fourth Amendment (Count IV), as briefed above, and incorporating by reference past briefings [*see, e.g.,* 3-1, 14, 23, 25, 35, 53],

2.    Chilling of First Amendment-protected speech and expressive activity (Count V), as briefed above, and incorporating by reference past briefing [*see, e.g.,* 3-1, 14, 23, 25, 35, 53],

Assuming the Court finds that Fernandez was unreasonably seized and/or that his First Amendment-protected speech and activity were chilled, Fernandez must then show how the County is liable.  To do so, Fernandez must next establish the requisite degree of fault on the part of the county and a causal link between the County's municipal policy and the alleged violation. *Id.* (*citing City of Canton v. Harris,* 489 U.S. 378 (1989)). Such a showing requires either the existence of a municipal policy that violates federal law on its face or evidence that the municipality has acted with "deliberate indifference" to an individual's federal rights.  *Id.* (*citing Board of the Cnty. Comm'rs v. Brown,* 520 U.S. 397 (1997)).

Fernandez observes that since he is challenged a duly-enacted and enforced County ordinance, that there is no dispute that there is *Monell* liability to the extent that the ordinance is unconstitutional on its face.  *Snider v. City of Cape Girardeau,* 861 F. Supp. 2d 974, 981 (E.D. Mo. 2012*), aff'd* 752 F.3d 1149 (8th Cir. 2014) (holding City would be liable under *Monell* if plaintiff had been charged under a facially unconstitutional flag-burning ordinance).  As such, there is undisputedly *Monell* liability since Fernandez's citations, arrests and prosecutions under Section 804.050 flowed directly from a policymaker's deliberate choice reflected in an official policy or action.  *Szabla v. City of Brooklyn Park, Minn.,* 486 F.3d 385, 389 (8th Cir.2007).

**b.  Damages**

What, then, are Fernandez's damages?  Fernandez suggests that based on the Stipulated Facts that his damages are as follows:

1.      64 citations for violations of three challenged ordinances, including 30 citations for violations of the Solicitor license ordinance, 16 citations for violations of the Roadway Solicitation ordinance, 8 citations for violations of the Vagrancy ordinance, 2 citations for violation of the Peddlers' ordinance (Plaintiff presumes this was a citation in error to the wrong part of the Code), and 9 citations for unspecified ordinance violation.[3]  Stip. ¶ 41.

2.      Four arrests and seizures under Section 804.050 for a total of 29 hours, 2 minutes for charges under the two solicitation ordinances, of which 12 hours and 30 minutes were post-filing of this lawsuit.  Stip. ¶ 51.

3.      On numerous occasions County officers have come up on Fernandez while he was begging and told him to move along, either because he had a license for the wrong intersection, or the wrong date, etc.  Stip. ¶ 44.  He did so-which was a constructive restriction on his liberty as a free citizen.

4.      The burden of the Solicitor license application (taking anywhere from 8 days to two-three weeks, requiring two trips to County government buildings in Clayton, the payment of fees of $13, completing notarized paperwork, and attaching a photograph of himself), as well as the Schedule I intersection licensing process that must occur annually.

5.      Fernandez' attendance at all County municipal court hearings at which he underwent continued prosecution and was forced to retain counsel.

---

[3] 24 of the citations plus 12 hours, 30 minutes of his seizures pursuant to arrest occurred during the pendency of this Section 1983 lawsuit, which was filed on June 5, 2019.

6.    Reasonable and objective fear by Fernandez of continued enforcement for engaging in First Amendment-protected speech and expressive activity.

7.    As a result of handcuffing, Fernandez's shoulder was dislocated and injured during at least one arrest, and on that day a physician had to put his shoulder back in place.  Stip. ¶ 58; Pltf. Ex. 43.  (Fernandez does not make a damages claim for excessive force, but his damages for unlawful seizure include the pain and suffering associated with that shoulder injury and hospital visit to fix the problem.)  Fernandez has no lasting injuries from that situation.

8.    Fernandez has only garden variety emotional distress.

Fernandez notes that the County has alleged (and Fernandez has stipulated) that on certain occasions that he has stepped into traffic lanes to receive alms.  That is not the basis of his argument for either injunctive relief or for damages.  Further, whether or not Fernandez was in the roadway is wholly irrelevant to any arrest under the Solicitor License ordinance, since the element of the offense that is critical is whether or not he had a valid Solicitor License, and not a sidewalk v. roadway distinction as to the location of his solicitation.

Fernandez respectfully requests that that the court value his damages at a floor of $150,000.

Recent precedent in the St. Louis region bears out such an amount.  A St. Charles County working mother was arrested and jailed for three hours on a warrant for a City of St. Peters ordinance that did not exist.  In 2019, a St. Charles County jury—by reputation conservative with verdicts against government defendants—awarded her damages verdict of $100,000, for which remittitur was denied, and which award was subsequently affirmed on appeal.  *Roeder v. City of St. Peters, et al.,* No. 1511-CC01064-01 (St. Charles County Circuit Court, Mo., Mar. 29, 2019),

*aff'd,* ED107997 (Mo. Ct. App. E.D. Feb. 11, 2020) (unpublished), *transfer denied,* 599 S.W.3d 491 (Mo. Sup. Ct., June 2, 2020).  That was on a sole count of Missouri state law malicious prosecution (one of the pending counts here), but Plaintiff observes that for valuing damages that is a distinction without a difference.  The *Roeder* plaintiff was jailed only three hours based on one arrest, and suffered no physical injuries.  A damages floor of 1.5 times that amount seems fair.

To state the obvious, even though Robert Fernandez is a poor, homeless person and the *Roeder* plaintiff was a middle-class working mother, the value of his freedom is the same as hers.

To be sure, it is difficult to value loss of liberty, garden variety emotional distress, and one shoulder injury.  Nevertheless there are other good comparative cases, both locally and around the nation.

In *Robinson v. City of St. Louis, Missouri,*, No. 4:17-CV-156 PLC, 2020 WL 4673823, at *11 (E.D. Mo. Aug. 12, 2020) the jury awarded for an unlawful search a verdict of $200,000 in compensatory damages and $100,000 in punitive damages.

In *Gardner v. Texas Discount Gasoline,* 1985 WL 667662 (St. Louis City Circuit Court, Mo. 1985), the plaintiffs were awarded $58,000 (that is, $139,664 in 2020 dollars) for emotional distress and humiliation after 2- to 3-hour detention for an alleged (then abandoned) claim of stealing gas from a gas station.  The Eighth Circuit has upheld a $100,000 jury verdict for a half day of over-detention.  *Young v. City of Little Rock,* 249 F.3d 730 (8th Cir. 2001) (worth about $146,385 in 2020 dollars).  In California, a 2004 settlement was entered for $100,000 for less than a day in custody in *Jones v. County of Los Angeles,* 04-cv-8286 DDP (S.D. Ca.) ($137,163 in 2020 dollars).  *See also Jaipersaud v. Ashley,* No. 10-cv-455-SCJ (N.D. Ga.) ($137,500 jury verdict in 2012 for 10 hours ($87,500 in compensatory damages and $50,000 in punitive

damages) for a wrongful arrest with ten hours in jail, or $155,171 in 2020 dollars); *Combs v. Blowes, et al,* No. 1561 C.D. 2013 (Phila. County, Pa. 2012) ($176,000 jury verdict upheld for Teacher's Aide arrested at work based on officer's false Affidavit, or $195,752 in 2020 dollars).

On October 25, 2012, a Maryland jury awarded a plaintiff some $5.6 million for damages incurred after he was arrested in Washington, D.C. on an invalid computer entry indicating an active bench warrant from Prince George County, MD, and held for five days. *Harper v. State of Maryland, et al.,* 2012 WL 10861896 (Md. Cir. Ct. 2012). On remittitur, the trial court reduced the award to $200,000 (or to $878,000 if Court of Appeals held Maryland-specific caps on damages were unconstitutional); that would be $225,704 in 2020 dollars.

Plaintiff also draws the court's attention to *Willson v. City of Bel-Nor, Missouri*, No. 4:18-CV-3 RLW, 2020 WL 3639745, (E.D. Mo. July 6, 2020), a sign ordinance case in Bel-Nor in St. Louis County in which the court entered a permanent injunction on similar analysis to the analysis relevant here. In that case the facts of the damages appear to be modest because the only damages were receiving a court notice one time and the Plaintiff was able to keep his signs up throughout the litigation. The Honorable Ronnie L. White of this Court had set the matter for bench trial on damages, but a few days ago the parties settled that issue. The settlement amount is not yet public record.

Fernandez reiterates that he suffered 24 prosecutions and one arrest after he filed this suit, and it is thus proven that the County continued to violate Plaintiff's constitutional rights long after it was well aware that the ordinances were under attack and had significant frailties.

Fernandez's damages request is well within the bounds of reasonableness and conscience, both locally and nationally.

**V**.      **Attorney's Fees & Costs**

18

### a. <u>Standing & Standard of Review</u>

A court has discretion to award reasonable attorneys' fees to a party who prevails in a claim filed under 42 U.S. C. § 1983. 42 U.S.C. § 1988(b).  Importantly, a trial court's "discretion to deny attorneys' fees to a prevailing plaintiff is narrow." *Jenkins ex rel. Jenkins v. Missouri,* 127 F.3d 709, 716 (8th Cir. 1997); *Christianson v. Markquart*, No. CV 16-1034 (JRT/KMM), 2018 WL 3474058, at *1 (D. Minn. July 19, 2018).

The Eighth Circuit reviews legal issues relating to fee awards *de novo* and factual determinations for abuse of discretion.  *See Cody v. Hillard,* 304 F.3d 767, 772 (8th Cir. 2002). The party seeking the award must submit evidence supporting the requested hours and rates, making "a good faith effort" to exclude hours that are "excessive, redundant, or otherwise unnecessary." *Hensley v. Eckerhart,* 461 U.S. 424, 433-34 (1983). The fee applicant must also use "billing judgment" to exclude hours that would not properly be billed to a client, because time not properly billed to a client should not be paid by an adversary pursuant to statutory authority.  *Id*. at 434.

To determine reasonable attorneys' fees under Section 1988, "the most useful starting point is . . . the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Id*. at 433. This calculation is referred to as the "lodestar approach." *See, e.g., Perdue v. Kenny A. ex rel. Winn,* 559 U.S. 542, 552 (2010).  There is a strong presumption that the lodestar calculation represents a reasonable fee award.  *City of Burlington v. Dague,* 505 U.S. 557, 562 (1992).

When a plaintiff has only limited success, the extent of that success "is a crucial factor in determining the proper amount of an award of attorneys' fees under 42 U.S.C. § 1988." *Hensley,* 461 U.S. at 440, *Robinson v. City of St. Louis, Missouri,*, No. 4:17-CV-156 PLC, 2020 WL

19

4673823, at *11 (E.D. Mo. Aug. 12, 2020).  The court must consider whether a plaintiff's unsuccessful claims "were unrelated to the claims on which [the plaintiff] succeeded" and whether "the level of success" achieved by the plaintiff "makes the hours reasonably expended a satisfactory basis for making a fee award." *Id*. at 434.  When a plaintiff's claims "involve a common core of facts or [are] based on related legal theories, [m]uch of counsel's time will be devoted generally to the litigation as a whole." *Id*. at 435. In that situation, "the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Id.*

"Where a plaintiff has obtained excellent results, [the plaintiff's] attorney should recover a fully compensatory fee, [which will n]ormally . . . encompass all hours reasonably expended on the litigation." *Id*. Significantly, the Eighth Circuit has explained this as meaning that a "plaintiff who has won excellent results . . . is entitled to a fully compensatory fee award, which will normally include time spent on related matters on which [the plaintiff] did not win." *Jenkins,* 127 F.3d at 716 (emphasis added).

If, however, "a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount." *Hensley,* 461 U.S. at 436. As the Supreme Court concluded:

> Where the plaintiff has failed to prevail on a claim that is distinct in all respects from [the plaintiff's] successful claims, the hours spent on the unsuccessful claim should be excluded in considering the amount of a reasonable fee. Where a lawsuit consists of related claims, a plaintiff who has won substantial relief should not have [the plaintiff's] attorney's fee reduced simply because the district court did not adopt each contention raised. But where the plaintiff achieved only limited success, the district court should award only that amount of fees that is reasonable in relation to the results obtained.
>
> *Id.* at 440.

The principle of awarding a fully compensatory fee to plaintiffs who have not prevailed on all of their asserted claims recognizes that:

> in the real world, litigation is more complex [than in the movies], involving multiple claims for relief that implicate a mix of legal theories and have different merits. Some claims succeed; others fail. Some charges are frivolous; others (even if not ultimately successful) have a reasonable basis. In short, litigation is messy, and courts must deal with this untidiness in awarding fees.
>
> Given this reality, we have made clear that plaintiffs may receive fees under Section 1988 even if they are not victorious on every claim. A civil rights plaintiff who obtains meaningful relief has corrected a violation of federal law and, in so doing, has vindicated Congress's statutory purposes. That "result is what matters," we explained in Hensley . . ., 461 U.S. [at] 435 . . . : A court should compensate the plaintiff for the time [the plaintiff's] attorney reasonably spent in achieving the favorable outcome, even if "the plaintiff failed to prevail on every contention." I[d]. The fee award, of course, should not reimburse the plaintiff for work performed on claims that bore no relation to the grant of relief: Such work "cannot be deemed to have been expended in pursuit of the ultimate result achieved." I[d]. (internal quotation marks omitted). But the presence of these unsuccessful claims does not immunize a defendant against paying for the attorney's fees that the plaintiff reasonably incurred in remedying a breach of [the plaintiff's] civil rights.

*Fox v. Vice,* 563 U.S. 826, 834 (2011). Rather, "Congress authorized fees to plaintiffs to compensate them for the costs of redressing civil rights violations; accordingly, a plaintiff may receive fees for all work relating to the accomplishment of that result, even if 'the plaintiff failed to prevail on every contention raised.'" *Fox,* 563 U.S. at 836 n.3 (quoting *Hensley,* 461 U.S. at 435).

A prevailing plaintiff "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." *Hensley,* 461 U.S. at 429. A prevailing party may also recover as part of an award under Section 1988 the party's "[r]easonable expenses of litigation." *SapaNajin v. Gunter,* 857 F.2d 463, 465 (8th Cir. 1988). Such expenses are "the sort that lawyers ordinarily include in their bills to clients." *Neufeld v. Searle Labs.,* 884 F.2d 335, 342 (8th Cir. 1989) (Age Discrimination in Employment Act case).

### b.    Plaintiffs' Fee Award

### 1.    Prevailing plaintiff status

In general, prevailing party status "is determined on the outcome of the case as a whole, rather than by piecemeal assessment of how a party fares . . . along the way." Jenkins, 127 F.3d at 714.  So far, the court has enjoined the Vagrancy Ordinance, (Count III), and Fernandez anticipates the court will follow its indication that it will enjoin the Roadway Solicitation Ordinance (Count II).  (The County has indicated that it will not challenge entry of an injunction against it on Count II).  That leaves only the Solicitor license ordinance (Count I) at issue, which is being submitted on trial briefs.  Although Fernandez asserts that he is entitled to his reasonable attorney's fees and costs under 42 U.S.C. 1988, he has not broken down such fees and costs by claim since his claims stem from a common core or nexus of facts.  *Hensley,* 461 U.S. at 435. The one potential exception to the "common core" is that all four of Fernandez's seizures stemmed solely from the Solicitor license ordinance, Section 804.050, and not the other two ordinances.  Still, given that Fernandez's claims all stem from the same conduct, that is, his solicitation of alms from stopped motorists, mostly at I-55 and Lindbergh, it is impossible to pull the facts apart.

Plaintiff acknowledges that it is unusual to submit a fee application at the same time as the final briefing on the merits, but given the somewhat unusual procedural posture given COVID-19, the waiver of a formal trial, and the procedural posture of Counts III and II, Plaintiff suggests that submission of the fee application at this time will promote judicial economy.

Plaintiff delivered to Defendant's counsel an almost final version this fee application portion of the brief on September 3, 2020, one week before final briefing is due, so that the County has had time to include a response to its request in its briefing.  (Nevertheless, the

County has suggested it will need an extra few days to respond on damages and fees, and Plaintiff has no objection thereto).

### 2.    <u>Hourly rates</u>

Fernandez requests hourly rates of $575 for Mr. Schock, and $475 for Mr. Eastwood. Undersigned counsel submit their own affidavits (Exs. 46, 49) and two each respectively from respected local attorneys, Robert Herman and C. John "Chet" Pleban on behalf of Mr. Schock (Exs. 47, 48), and Matthew Fry and Chris Hoell on behalf of Mr. Eastwood (Exs. 50, 51). Plaintiff suggests that the affidavits demonstrate that undersigned counsel's requested hourly rates are consistent with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.  Fernandez also suggests that the court apply current hourly rates to all hours his attorneys expended on this slightly more than one-year-old case, rather than "historic hourly rates" for services as they were rendered.  *Missouri v. Jenkins by Agyei*, 491 U.S. 274 (1989).

In general, "a reasonable hourly rate is the prevailing market rate, that is, the ordinary rate for similar work in the community where the case has been litigated." *Moysis v. DTG Datanet*, 278 F.3d 819, 828-29 (8th Cir. 2002) (quotation marks and citation omitted). In setting a reasonable hourly rate, a court may consider its own experience and knowledge of prevailing market rates, as well as the experience, skill, and expertise of the attorney seeking an award under Section 1988.  *See Hanig v. Lee,* 415 F.3d 822, 825 (8th Cir. 2005) (court's own knowledge); *Hendrickson v. Branstad,* 934 F.2d 158, 164 (8th Cir. 1991) (hourly rates for a Section 1988 award should reflect counsel's "special skill and experience") (citation omitted).

Plaintiff also refers the court to the annual published billing survey in Missouri Lawyers Weekly, a legal publication of record, which notes that in 2019 that the average hourly billing

rate in Missouri was $370, Ex. ____.  Although the 2019 survey does not have elaborate data on

civil rights lawyers, it does note that out of-state lead counsel from Alliance Defending Freedom

(from Arizona and D.C. respectively), bill at $695 and $500 for First Amendment litigation and

two in-state attorneys in that case billed at $495 and $450.

In *Blum v. Stenson*, 465 U.S. 886, 893 (1984), the Supreme Court emphasized that fees

awarded in civil rights litigation should be governed by the same standards which prevail in

other types of equally complex federal litigation, such as antitrust cases.  To say the least,

Section 1983 is a complex area of the law.  Plaintiff's counsel, nevertheless, have devoted

substantial portions of their careers to this area, and suggest to the court that given their

experience and lack of wasted time, these fees are reasonable under the circumstances.

Federal district courts in Missouri have recognized such rates.  Judge Ross recently wrote

about St. Louis market billing rates in *Keller v. Am. Bottling Co.*, No. 4:19-CV-02895-JAR, 2020

WL 3412236, at *2 (E.D. Mo. June 22, 2020):

> A survey of recent cases awarding attorney fees show a range of approved hourly rates,
> from as little as $240 to as much as $712.69.
>
> *See Rapp v. #1 A LifeSafer of Missouri, Inc.*, No. 4:19-CV-02796-SRC, 2020 WL
> 3077144, at *2 (E.D. Mo. June 10, 2020) ($400/hour); *Jo Ann Howard & Assocs., P.C. v.
> Cassity*, No. 4:09-CV-01252 ERW, 2020 WL 870987, at *8 (E.D. Mo. Feb. 21, 2020)
> ($240 and $712.69/hour).

Here, the respective rates sought by counsel--$575 and $475—are well within that range.

*See also M.B. v. Tidball,* No. 2:17-cv-4102-NKL (W.D. Mo. Apr. 3, 2020) (upholding rates of

$500, $475 and $450 for lead counsel); *see also Howard v. Cassity,* No. 4:09-CV-01252 ERW

(E.D. Mo. Feb. 21, 2020) (recognizing fee ranges of $712 to $420 for counsel in an intentional

misconduct case).  To be sure, there are cases with lower fee awards, but they are distinguishable.

*Cf. Trinity Lutheran Church of Columbia, Inc. v. Comer,* No. 2:13-cv-4022-NKL (W.D. Mo. Nov.

7, 2018)  (docking out-of-state counsel for applying higher out-of-state rates for the mid-Missouri market in Jefferson City, inapposite here to the St. Louis market).

With some trepidation, Plaintiff draws the court's attention to *Robinson v. City of St. Louis, Missouri,*, No. 4:17-CV-156 PLC, 2020 WL 4673823, at *11 (E.D. Mo. Aug. 12, 2020), an unreasonable search case in which Plaintiff achieved the above mentioned verdict of $200,000 in compensatory damages and $100,000 in punitive damages.  Prosecution of the case involved the usual legal proceedings, an interlocutory appeal and a three-day trial.  Plaintiff's counsel sought $960,307.50 in fees including a 1.5x lodestar fee enhancement.  Judge Cohen awarded, after all reductions, $335,202.80.  With respect to counsel in that case, Plaintiff's counsel here attempts to ask for what is reasonable, on the hope the court will award that which is asked. *Robinson* is also distinguishable as follows:

    a.    There were no novel questions of law in *Robinson*, a run-of-the-mill damages case, let alone constitutional challenges.  Here, by contrast, there were challenges to longstanding government legislation based on novel Supreme Court and Court of Appeals precedent;

    b.    Here, counsel is this matter can be considered independently for their respective experience, education, reputation, and ability;

    c.    Here, there were only two plaintiff's counsel on this matter, so no issues of overlawyering, let alone billing for clerical tasks;

    d.    Here, no enhancement over the lodestar is sought;

    e.    Here, there was no wasted time.

Further, Plaintiff's fees can also be compared to a recent case in which defendant County hired outside counsel.  That is, the County paid a sizeable team of lawyers from a St. Louis law

firm (Lewis Rice) up to $582 per hour to bring post-trial motions on a $20 million Missouri

Human Rights Act verdict involving discrimination because of sex.  *See* Jeremy Kohler, *St.*

*Louis County Counsel approves Additional Money for Law Firm in Wildhaber case,* St. Louis

Post-Dispatch (Jan. 7, 2020), available online at

> https://www.stltoday.com/news/local/crime-and-courts/st-louis-county-council-approves-additional-money-for-law-firm-in-wildhaber-case/article_cdd98165-e7cb-5e37-a019-1ea725f398ba.html

> (last accessed September 2, 2020).

There is no reason to argue that § 1983 cases are anything less compensable.  *Cf.*

*Robinson, above,* at *7 where the court looked at it the opposite way:  "To the extent that

Plaintiff argues that her attorneys should receive a higher rate for section 1983 cases than they do

for employment discrimination cases, she fails to provide any supporting authority."

Further, in the *Wildhaber* matter our defendant St. Louis County had to keep expanding

the amount of attorney's fees it was prepared to spend on post-trial work.  On November 27,

2019, the St. Louis Post Dispatch wrote:

> The County Council on Nov. 5 approved a contract for $75,000 to hire Lewis Rice to handle its response to the verdict. On Monday, Page asked the council to double that amount to $150,000. In a written request for the council to consider the matter at a future meeting, Page cited "the volume of materials, complexity and significance" as reasons for the increase.

> https://www.stltoday.com/news/local/crime-and-courts/lawyers-for-st-louis-county-fighting-20-million-verdict-with-argument-its-legal-to-discriminate/article_4fd06461-7e27-51c5-a6ca-13b88285e343.html

> Last visited September 1, 2020.

A few weeks later the Post-Dispatch reported:

> The St. Louis County Council on Tuesday approved a measure to increase to $225,000 the amount the county will spend on an outside law firm to handle legal work connected to a nearly $20 million verdict in a discrimination lawsuit

> …

St. Louis County Circuit Judge David Vincent III ordered both sides into mediation in mid-November, but the process so far has not resulted in a settlement. Lewis Rice has put five attorneys on the case with hourly rates ranging from $182 to $582

https://www.stltoday.com/news/local/crime-and-courts/st-louis-county-council-approves-additional-money-for-law-firm-in-wildhaber-case/article_cdd98165-e7cb-5e37-a019-1ea725f398ba.html

Last visited September 1, 2020.

The St. Louis Post Dispatch reported in an article on September 8, 2020 that the "county has paid Lewis Rice $421,257 over the past year" in that case.

It hardly seems out of line for Plaintiff's counsel here, who handled the case from start to finish, to receive amounts which are but a portion of the amount the County is paying a major law firm to handle just the post-trial proceedings of the Wildhaber case.

### 3.    Hours

Plaintiff seeks compensation for Mr. Schock's 107.4 hours and Mr. Eastwood's 161.6 hours. Plaintiff contends that the reported hours conveyed by their time records, Exs. 47 and 48, which were derived from contemporaneous records, were reasonable and necessary to the prosecution of this lawsuit.  The vast majority of the hours were spent on work in this Section 1983 lawsuit.  A modest minority were spent on work in the underlying County municipal court litigation.  Those hours are still compensable, however, as Fernandez faced both pending and then new and ongoing charges at the time this litigation was filed, and the charges were for the very conduct at issue in this matter.  Furthermore, Fernandez could hardly have plead guilty or been convicted of the ordinances and pursued his claims here; nor is any criminal (or, technically, quasi-criminal) defendant expected to relinquish his rights under the Fifth, Sixth and Fourteenth Amendments.  Since those hours arose out of the same common core of facts and legal issues (indeed, Fernandez won a motion to dismiss in County municipal court on similar

27

grounds to his claims here), and as subsequent charges came in they were dismissed, then those hours are also compensable.

Fernandez notes that from very initiation of this lawsuit that he attached extensive briefing to his complaint and motion for preliminary injunction. The County fought back, as it has every right to do. Fernandez suggests, however, that the case law made clear the frailties of the County's ordinances. A defendant cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response. *See City of Riverside v. Rivera*, 477 U.S. 561, 580 n.11 (1986) (plurality opinion).

Mr. Schock and Mr. Eastwood's hours were not duplicative. Nor should Plaintiff be penalized for hiring two lawyers. The Eighth Circuit has also noted that private clients with complex matters are commonly represented by two or more lawyers at trial, and there is no reason why civil rights plaintiffs should be limited to a legal team with fewer members than necessary to handle the case. *Bowman v. Pulaski County*, 723 F.2d 640, 646 (8th Cir. 1983); *see also Delph v. Dr. Pepper Bottling Co.,* 130 F.3d 349 (8th Cir. 1997) (affirming award of statutory fees to three attorneys representing the successful plaintiff in a Title VII suit); *but see Robinson*, where the court showed dismay at three lawyers working at a time.

In rejecting a lodestar enhancement request the *Robinson* court said at 11:

> The United States Supreme Court has recognized that an enhancement may be appropriate where: (1) the method used to determine the hourly rate employed in the lodestar calculation "does not adequately measure the attorney's true market value"; (2) "the attorney's performance includes an extraordinary outlay of expenses and the litigation is exceptionally protracted"; or (3) there exist "extraordinary circumstances in which an attorney's performance involves exceptional delay in the payment of fees." *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 556 (2010).

In this matter, undersigned counsel believe they meet none of those criteria and so they do not seeking an enhanced fee beyond the lodestar. *Blum v. Stenson*, 465 U.S. 886, 897 (1984). They emphasize, however, that they believe the lodestar is fair.

Times spent preparing the fee application is compensable, but may not be excessive, *El-Tabech v. Clarke*, 616 F.3d 834, 843 (8th Cir. 2010). Again, the *Robinson* matter shows how it is not to be done. Plaintiff's application there included what the judge characterized as "over six days" for preparation of the fee application. Plaintiff's request for that amount of time was not well received. Here Mr. Schock's time on fee application was 7 hours, and Mr. Eastwood's time on that process was approximately 4 hours, less than a day and a half. Plaintiff suggests those fees are not excessive.

All of Plaintiff's expenses are taxable, and post judgment Plaintiff will submit a bill of costs.

Plaintiff has not charged mileage for travel around St. Louis County, for copying, or for other costs normally borne by attorneys as part of non-compensable routine office expenses and overhead.

### 4.  Summary of Amount Requested

Plaintiff seeks attorney's fees  as follows:

| Mr. Schock: | 107.4 hours at $575.00 for a total of | $61,755.00 |
|---|---|---|
| Mr. Eastwood, | 161.6 hours at $475.00 for a total of | $76,760.00 |
|  | For a grand total of: | $138,515.00 |

## V.  Conclusion and Prayer

The Solicitor license and the Schedule I intersections designated by St. Louis County Code Chapter 804, particularly Section 804.050 *et seq.,* are content based, and are not narrowly

tailored to achieve any compelling interest in traffic safety and efficiency. There are obviously less restrictive means for the County to promote trafficway safety and efficiency. Nor has the County shown "that it considered different methods that other jurisdictions have found effective." *McCullen,* 134 S. Ct. at 2539.

Plaintiff prays the Court permanently enjoin the Solicitor License (County Code Section 804.050), and award him compensatory damages of at least $150,000.00; to declare Plaintiff the prevailing party, and to award him his reasonable attorney's fees of $138,515.00 with Plaintiff to submit a bill of costs; and for such other relief as may be just, meet and reasonable.

Respectfully submitted,

Co-Counsel for Plaintiff


  /s/ W. Bevis Schock   .
W. Bevis Schock, 32551MO
Attorney at Law
7777 Bonhomme Ave., Ste. 1300
St. Louis, MO  63105
wbschock@schocklaw.com
Fax:    314-721-1698
Voice:  314-726-2322

  /s/ Hugh A. Eastwood   .
Hugh A. Eastwood, 62058MO
Attorney at Law
7911 Forsyth Blvd., Ste. 300
St. Louis, MO 63105
hugh@eastwoodlawstl.com
314-809-2343
314-863-5335 fax

CERTIFICATE OF SERVICE

The undersigned certifies that on 9/10/2020 that (s)he served this document on all counsel of record by CM/ECF electronic filing.
/s/ W. Bevis Schock