## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT FERNANDEZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.  4:19-CV-01638-SNLJ |
| v. | ) | |
| | ) | |
| ST. LOUIS COUNTY, MISSOURI, | ) | |
| | ) | |
| Defendant. | ) | |

### DEFENDANT'S TRIAL BRIEF

COMES NOW Defendant St. Louis County, Missouri, by and through undersigned counsel, and hereby files its Trial Brief with the Court.

### INTRODUCTION

It is undisputed that almost every day, Plaintiff Robert Fernandez begs for money at intersections located in south St. Louis County.  He primarily solicits money at the intersection of Interstate 55 and Lindbergh Blvd., on the northbound exit ramp of Interstate 55. The Plaintiff has done this since 2015 and he continues to solicit at this location.  The Plaintiff's choice of that intersection is not accidental.  The intersection is a high-volume traffic intersection, with two exit ramp lanes from Interstate 55 ("I-55") onto northbound Lindbergh Blvd.  The Plaintiff prefers the northbound exit lanes because he receives more money there.  The intersection has no crosswalks or pedestrian crossing signals.  The Plaintiff's soliciting generates a significant number of calls to the St. Louis County Police Department.  Callers complain that the Plaintiff walks down the exit ramp of northbound I-55, approaches vehicles for money and will walk into traffic to receive donations from vehicles.  In the past two years, citizen complaints about panhandlers and solicitors at intersections in South St. Louis County, have increased.  Two

1

accidents involving solicitors have occurred in St. Louis County. The increase of persons soliciting at intersections, including the Plaintiff, creates a public safety risk. Police officers have performed their duty by responding to the citizen complaints for solicitors and citing persons who are soliciting in violation of County ordinances, including the Plaintiff.

## HISTORY OF THE CASE

Plaintiff seeks a permanent injunction to halt enforcement of St. Louis County's Peddlers and Solicitor's Code, Chapter 804 (Count I), and the Soliciting in the Roadway ordinance, Section 1209.090 (Count II). The Plaintiff also seeks damages for his arrest under those allegedly unconstitutional ordinances and the vagrancy ordinance, Sections 716.080 and 716.090 (Count III). The Plaintiff requested a preliminary injunction after filing his complaint and the Court granted Count III of the Plaintiff's complaint and enjoined the vagrancy ordinance. On February 6, 2020, the Defendant filed a motion for judgment on the pleadings as to Section 1209.090, which the Court denied. The Court stated that Section 1209.090 was content-based, and that it would be analyzed under the strict scrutiny standard. The Court determined that the case should be consolidated and a trial held regarding the request for permanent injunction, damages and Plaintiff's request for attorney's fees. The complaint also contains claims for the Plaintiff's fourth amendment seizure (Count IV), First Amendment chilling (County V) and malicious prosecution under Missouri state law (Count VI).

## ARGUMENT

Although soliciting for money, or begging, has not been recognized by the United States Supreme Court as a constitutional right, the act of asking for charity is a right protected by the First Amendment. *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632, 100 S.Ct. 826, 63 L.Ed2d 73 (1980). Regardless of this, speech can be regulated by the government.

*U.S. v. Steven*, 599 U.S. 460, 468, 130 S.Ct. 1577, 176 L.Ed 73 (1980). See *Village of Schaumburg, 444 U.S. 620 at* 632. ("Soliciting financial support is undoubtedly subject to reasonable regulation.") Additionally, a "city has a legitimate interest in promoting the safety and convenience of its citizens on public streets." *Gresham v. Peterson,* 225 F.3d 899, 906 (7th Cir. 2000). As a threshold matter, none of the cases cited by the Plaintiff in support of its request for permanent injunction involve a license or permit scheme for solicitation. Notably, *Rogers v. Bryant*, 942 F.3d 451 (8th Cir. 2019), in which a loitering ordinance was struck down, is clearly distinguishable from the case at bar, because the Arkansas law was a prohibition on begging which is not comparable to the County solicitation ordinances, which clearly permit all forms of solicitation. This should alter the Court's analysis of the County ordinances in this case.

## *Reed* Standard

In *Reed v. Town of Gilbert Ariz*, 135 S. Ct. 2218 (2105), the Supreme Court clarified the analysis to distinguish a content-based statute and a content-neutral statute. In *Reed,* the Court considered whether the First Amendment rights of a plaintiff were violated by a municipal law that regulated the display of outdoor signs. "A government regulation of speech is content based if a law applies to a particular speech because of the topic discussed or the idea or message expressed." *Id.* at 2227. The Court further concluded that a statute's content-neutrality must be determined on its face before the government's justification for such a regulation is examined." *Id.* at 2228. Applying the strict scrutiny analysis required for content-based statutes, the Court held that the town had not offered a compelling interest for sign regulations and that the regulations were not sufficiently narrowly tailored to further the government interests asserted. *Id.* at 2231-32. Any regulation must be narrowly tailored so that it "promotes a substantial government interest that would be achieved less effectively absent the regulation." *Ward v. Rock*

*Against Racism*, 491 U.S. 781, 799 (1989) (citation omitted).  Under strict scrutiny analysis, a challenged law will only survive if it is narrowly tailored to further a compelling government interest.  *Reed,* 135 S. Ct. at 2231.

Compelling Interest

Two significant restrictions are not found in the peddlers and solicitation code.  First, the ordinance does not explicitly prohibit panhandling or begging.  Second, the ordinance does not require any approval of the content of any message that the applicant wants to express during solicitation.  If the Court determines that Chapter 804 is a content-based regulation, it will have to survive strict scrutiny.  Strict scrutiny is a two-pronged analysis that determines whether the regulation at issue "furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*, 135 S. Ct. at 2231 (internal quotation and citation omitted). The County ordinance meets strict scrutiny analysis because it was enacted to further a compelling government interest of public safety and is narrowly tailored to serve that interest.  It is important to note that prior to *Reed*, the government's motivation in enacting a particular regulation was often viewed as determinative to the content-neutrality of that regulation. The Supreme Court has underscored the importance of a government's motive in enacting a particular statute. In *Ward v. Rock Against Racism*, 491 S.S. 781, 791 (1989), the Court explained this consideration as follows: "[t]he principal inquiry in determining content neutrality...is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." Further, "[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Id.* (citing *Renton v. Playton Theaters, Inc.*, 475 U.S. 41, 47-48 (1986)).  Following *Reed* and its

holding on facial determination of content neutrality, the government's motivation can be analyzed under the compelling interest that justifies an alleged content-based restriction.

The solicitation provisions of Chapter 804 are tied to the County's compelling interest of public safety.  Solicitors begging at intersections have increased in the County and there is an increased number of motorist complaints. *Joint Stipulation ¶¶52, 70, 71;Kriska aff. ¶12; Exh. J, p. 3.*  Many complaints have been about the Plaintiff, who is prompting calls from motorists when he solicits at his chosen intersection. *Stip. ¶69; Kriska ¶¶11-12; Defendant's Exh. A; Exh. E, pp. 1, 3, 5, 7; Exh. H, p. 3*  The Plaintiff sometimes walks into the roadway to receive donations from stopped vehicles. *Stip ¶58; Plaintiff depo. p. 65; ll. 4-16; Kriska aff. ¶8; Exh. I, p. 3.*  The Plaintiff has walked down the side of the exit ramp (shoulder) holding his sign to solicit from vehicles and has entered the second lane of traffic when soliciting. *Stip. ¶¶58-59; Kriska aff. ¶¶7, 15; Exh. F, p. 3.*  Vehicles on the exit ramp have moved away as the Plaintiff walks towards them. *Stip. ¶68; Kriska aff. ¶9; Exh. G, p. 3.*  There are two exit lanes on the northbound I-55 ramp at Lindbergh Blvd. *Stip. ¶56.*  There are no painted crosswalks or crossing signals at the intersection. *Stip. ¶57.*  There are no sidewalks connected to the intersection at I-55 and Lindbergh Blvd. *Stip. ¶11.*  The intersection handles a high volume of traffic and it allows traffic to maintain speed when exiting I-55 and turning onto northbound Lindbergh Blvd. when the light is green. *Stip. ¶¶30, 54-55.*  Solicitors who enter traffic lanes when traffic is moving can cause traffic to slow down, stop or move. *Stip. ¶60.*

Other solicitors sometimes occupy the intersection. *Joint Stip. ¶¶52, 70.*  Solicitors who enter traffic when cars are moving can be struck. *Stip. ¶61.*  Persons soliciting in the roadway create a safety hazard to themselves and to drivers. *Stip. ¶63; Dolly aff. ¶16.*  Drivers who donate money to solicitors can be distracted and cause accidents. *Stip. ¶62; Dolly aff. ¶¶22-24;*

*Schneider aff. ¶22.* There are risks to persons who solicit along roads and who walk into traffic. *Dolly aff. ¶¶16-21.* This risk is heightened at high-volume traffic intersections and intersections with higher speed limits, including Schedule I intersections. *Dolly aff. ¶¶28-29.* Limiting the number of solicitors at Schedule I intersections promotes public safety because it can reduce the risk of accidents to solicitors and vehicles. *Stip. ¶64; Dolly aff. ¶29; Schneider ¶13.* This is a situation where a hazard exists on roads, as compared to panhandlers soliciting on the sidewalks of a business district.

Provisions of Chapter 804, such as the three (3) day restriction at designated Schedule I intersections addresses this risk. No more than one permit for a designated Schedule I intersection is granted for each intersection on the same day. *Stip. ¶32; Kriska aff. ¶14.* This limits the number of solicitors near the road who can interact with traffic. Soliciting at a designated Schedule I intersection is limited to three days a year to reduce the number of solicitors at those intersections. *Stip. ¶31.* There have been two accidents at Schedule I intersections in St. Louis County within the last three years. *Stip. ¶¶65-67; Exh. B, p. 3; Exh. C, p. 4.* In one accident, a child fell off of a median and into the street, striking a car. *Id.* In another, an accident occurred even without a solicitor entering the road. *Id.* A driver who was getting a donation for the solicitor became distracted when getting money from his wallet and hit the car in front of him. *Id.*

The danger of pedestrians soliciting on medians or sides of roads who enter the street when running vehicles are present is far from speculative and is acknowledged by the courts. "[T]here can be no doubt from the evidence, as well as one's own common sense, that soliciting in the streets is inherently dangerous." *ACORN v. St. Louis County*, 726 F. Supp. 747, 753 (E.D. Mo. 1989). Other courts have commented on the "evident dangers of physical injury and traffic

disruption that are present when individuals stand in the center of busy streets trying to engage drivers and solicit contributions from them." *United States Labor Party v. Oremus,* 619 F.2d 683, 688 (7th Cir. 1980); See *Acorn v. City of Phoenix,* 798 F.2d 1260, 1269 (9th Cir. 1986) ("The direct personal solicitation from drivers distracts them from their primary duty to watch the traffic and potential hazards in the road, observe all traffic control signals or warnings, and prepare to move through the intersection."); *Int'l Soc'y for Krishna Consciousness v. City of Baton Rouge,* 668 F. Supp. 527, 530 (M.D. La. 1987) ("It requires neither towering intellect nor an expensive 'expert' study to conclude that mixing pedestrians and temporarily stopped motor vehicles in the same space at the same time is dangerous."). This is a public safety issue that is recognized a legitimate government interest. *See, e.g., Schenck v. Pro-Choice Network of W.N.Y.,* 519 U.S. 357, 375, 117 S. Ct. 855, 137 L.Ed.2d 1 (1997) (discussing "public safety and order" as a valid governmental interest). The St. Louis County accidents involving solicitors, the increased presence of solicitors at roads and intersections, the fact that drivers are using cellphones to call the police when driving, and their increased complaints about solicitors, including the Plaintiff, paint a clear picture of the compelling need for the County's soliciting ordinance. *Exhs. A, F-G; Stip. ¶¶65-66, ¶69, ¶71;Kriska aff. ¶¶11-12.*

The County Solicitors Code (Chapter 804 - §§804.010-804.260) consists of 27 separate provisions and the Peddler's Code provisions are not being challenged in this lawsuit. "A facial challenge to a legislative act is...the most difficult challenge to mount successfully. *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). To succeed, challengers must establish "that no set of circumstances exist under which the legislative act would be valid, or that the statute lacks any plainly legitimate sweep." *Phelps–Roper v. City of Manchester, Mo.,* 697 F.3d 678, 685 (8th Cir. 2012) (internal citations and quotations omitted). A statute "may also

7

be invalidated on a facial First Amendment challenge as overbroad if a substantial number of its applications are unconstitutional, judged in relation to its plainly legitimate sweep." *Id.*

Further, the solicitation code regulates *conduct* regardless of the message of the solicitor. "[I]t has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502, 69 S.Ct. 684, 93 L.Ed. 834 (1949); *see also. e.g., Rumsfeld v. Forum for Acad. & Institutional Rights*, 547 U.S. 47, 62, 126 S.Ct. 1297, 164 L.Ed.2d 156 (2006) ("The fact that [a law barring racial discrimination in hiring] will require an employer to take down a sign reading 'White Applicants Only' hardly means that the law should be analyzed as one regulating the employer's speech rather than conduct."). As the Supreme Court recognized, most recently in *Masterpiece Cakeshop. Ltd. v. Colo. Civil Rights Comm'n*, —— U.S. ——, 138 S.Ct. 1719, 201 L.Ed.2d 35 (2018), regulations of conduct "generally do not abridge the freedom of speech, even if they impose incidental burdens on expression." *Masterpiece Cakeshop*, 138 S.Ct. at 1741.

The U.S. Supreme Court has "developed a strong presumption of severability." *Barr v. American Association of Political Consultants, Inc.*, 140 S.Ct. 2335,2350 (2020). The Court presumes that an unconstitutional provision in a law is severable from the remainder of the law or statute. *Id.* For example, in *Free Enterprise Fund* v. *Public Company Accounting Oversight Bd.*, the Court set forth the "normal rule": "Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem, severing any problematic portions while leaving the remainder intact." 561 U.S. 477, 508, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010)(internal quotation marks omitted); see also *Seila Law*, —— U.S. at ——, ——

S.Ct., at ——, *ante*, at 32, 2020 WL 3492641 (same). In *Regan* v. *Time, Inc.*, the plurality

opinion likewise described a "presumption" in "favor of severability" and stated that the Court

should "refrain from invalidating more of the statute than is necessary." 468 U.S. 641, 652–653,

104 S.Ct. 3262, 82 L.Ed.2d 487 (1984).  Furthermore, the presumption recognizes that plaintiffs

who successfully challenge one provision of a law may lack standing to challenge *other*

provisions of that law.  See, *Murphy* v. *National Collegiate Athletic Assn.*, 138 S.Ct. 1461, 1487

(2018).

<u>Narrowly Tailored</u>

The Plaintiff argues that the solicitation provisions of Chapter 804 ("Peddlers and

Solicitors Code") are an unconstitutional restraint of First Amendment rights.  To

be narrowly tailored, a regulation must not "burden substantially more speech than is necessary

to further the government's legitimate interests." *Ward v. Rock Against Racism*, 491 U.S. 781,

799 (1989).  The solicitation provisions of Chapter 804 promote St. Louis County's compelling

interest in public safety.  The three (3) day restriction on soliciting at designated Schedule I

intersections limits the number of solicitors at those intersections. *Stip ¶31.*  No more than one

permit for a designated Schedule I intersection is granted for each intersection on the same day.

*Stip ¶32; Kriska aff. ¶14.* The solicitation ordinances of Chapter 804 allow St. Louis County to

limit the number of persons soliciting there.  The Defendant asserts that this promotes traffic

safety due to fewer solicitors interacting with motor vehicles. See *Acorn*, 798 F.2d at 1269.

Additionally, the ordinance allows the County to identify and examine the background of

persons applying to solicit.  The solicitation ordinance lays out a two-step process by which a

person wishing to solicit in St. Louis County can obtain a solicitor license. First, a person must

file for a solicitor license application. Second, the solicitor license application is investigated and

recommended for approval or disapproval. *Plaintiff Exh. 1, Section §§ 804.110-130.* A solicitor's license is good for six months and a person can solicit at any intersection in St. Louis County, except designated schedule I intersections. *Stip. ¶¶26, 42; Schneider aff. ¶¶27-28.* Designated Schedule I intersections are high-volume traffic intersections, and include locations with interstate exits. *Stip. ¶¶30, 54; Schneider ¶11.* A person must apply for a special permit to solicit there. *Stip. ¶29.* There are thirty-eight (38) designated Schedule I intersections where a person can solicit for three days each year. *Stip. ¶33.* A person chooses the designated Schedule I intersection he or she wishes to solicit at. *Section 804.165.* Only one designated Schedule I intersection permit is allowed for each Schedule I intersection each day. *Stip. ¶32; Kriska aff. ¶14.*

Additionally, Section 804 does not restrict what an applicant may say or how the applicant chooses to express himself when soliciting in St. Louis County. A solicitor is never required to present the sign he or she will use while soliciting. *Section 804.110-120.* The County ordinance does not contain any elements of censorship. *Id.* Reading the County ordinance *in pari materia* with other provisions of the Peddlers and Solicitors Code, it is clear that other types of speech are regulated by a registration requirement. The ordinance does exempt solicitors who are already licensed by a State of Missouri agency to solicit. *Section 804.060.* They have been previously investigated and approved by the state. Nonprofit solicitors do not have to obtain a solicitation license but must initially register with the County and pay a $10 fee before they can solicit. *Section 804.200.* The registration application is comprehensive and has sixteen (16) different categories of required information that nonprofits must provide:

> (a)   All names under which the nonprofit organization does business.
> (b)   The telephone number and principal place of business of the nonprofit organization.

(c)     The telephone number and address of each location from which the nonprofit organization will solicit funds from prospective donors in St. Louis County, either directly or through professional fundraisers.

(d)     The type of business entity of the nonprofit organization.

(e)     A statement of the nature and purpose of the nonprofit organization and the intended uses of the funds solicited.

(f)     The percentage of funds solicited by the nonprofit organization, over the past two (2) years, spent directly for the stated nonprofit purposes.

(g)     The percentage of funds solicited by the nonprofit organization, over the past two (2) years, spent for the costs of solicitations and fund raising.

(h)     If the nonprofit organization is a corporation, the name, address, position and telephone number of all officers and directors of the organization and its registered agent.

(i)     If the nonprofit organization is a partnership, the name, address and telephone number of all the partners of the organization.

(j)     The name, address, telephone number and interest owned by any person that owns ten (10) percent or more interest in the organization.

(k)     The name, address and telephone number of each professional fundraiser who will solicit funds for the organization.

(l)     The manner in which the professional fundraisers will be compensated for their solicitation activities.

(m)     The type of solicitation programs which will be utilized by the organization or the professional fundraisers.

(n)     The name, address and telephone number of all banks and other financial institutions in which the organization will deposit the funds solicited.

(o)     The name, address and telephone number of any other governmental agency, in Missouri, with which the charitable organization has been registered in the past three (3) years.

(p)     For the purpose of annual reporting, the ending date of the nonprofit organization's fiscal year. . .

*Section 804.200.*

Nonprofit solicitors must also file their annual report with the County each year after

registering and the report must include:

(1)     The current name, address and telephone number of the principal place of business of the nonprofit organization.

(2)     The current address and telephone number of each location from which the nonprofit organization will solicit funds from prospective donors in St. Louis County, either directly or through professional fundraisers.

(3)     The current name, address, position and telephone number of each officer, director or partner of the organization, and of its registered agent, if any.

(4)     The total dollar amount of funds solicited or collected by or for the organization in the preceding fiscal year.

   (5) The percentage of funds solicited and/or collected which was directly expended on the cost of fund raising or directly allocated to fund-raising activities.

   (6) The percentage of funds solicited or collected in the preceding fiscal year which was directly expended for the organization's nonprofit purposes or which was expended or donated for other charitable purposes.

   (7) The name, address and telephone number of all professional fundraisers who solicited funds on behalf of the organization in the preceding fiscal year.

   (8) The name, address and telephone number of each professional fundraiser the nonprofit organization plans to use in the upcoming fiscal year.

*Section 804.210.*

This rigorous registration requirement allows the County to regulate who is soliciting at intersections and know their identities. By reading the entire Peddlers and Solicitors Code, it is evident that the ordinances serve a public safety interest by identifying who is soliciting and requiring solicitors to undergo a background check.

Defined Standards For Approval

  The Plaintiff alleges that the County's soliciting ordinance is an unconstitutional restraint on speech. As argued in this brief, the ordinance does not impose any prior restraint on speech and is a permit scheme. Permit schemes have generally been upheld if the permits are not based on the subjective discretion of a government authority. Permit schemes have been struck down where a government has unbridled discretion and there are no limits on authority to grant or deny a permit. See *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 753 (1987) (municipal ordinance which gave mayor the authority to grant or deny annual news rack permits was held to be unconstitutional restraint on plaintiff's first amendment rights because the ordinance had no defined standards for exercise of government discretion); *Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123 (1992) (County ordinance allowing government official

to set fees for parades was unconstitutional because law did not contain definite and articulated standards for the determination of whether to charge a fee and how much to charge).

Comparing the ordinances in *City of Lakewood* and *Forsyth County,* the County's ordinance contains standards for issuance, has predicates for denial of a license application and reasons for revoking a solicitors license. A County solicitor license may be revoked or suspended for fraud, misrepresentation or false statement during the application process or in the "course of carrying on [the] business as a peddler or solicitor. " *Section 804.160.* The "Revocation of License" section allows revocation or suspension of a license for any person soliciting in such a manner "as to constitute a breach of the peace or to constitute a menace to the health, safety, or general welfare of the residents of St. Louis County." *Section 804.160 (e).* There are objective standards for denial of a license, including conviction history and prior solicitor license revocations.   The standards for denial or revocation of a solicitor license are narrowly tailored to the County's compelling interest in public safety.

Additionally, the licensing ordinance is not a backdoor type of censorship.  Licensing schemes have withstood First Amendment scrutiny where the ordinance does not censor or regulate the content of the speech at issue.  In *Billups v. City of Charleston*, 961 F.3d 673 (4th Cir. 2020), city tour guide applicants alleged that a licensing scheme implemented by the City of Charleston was an unconstitutional burden on their free speech rights.  The licensing scheme required any person acting as a tour guide for hire in the city to pass a written examination about Charleston's history and obtain a business license.  In determining whether the licensing scheme was content based or neutral, the court recognized that the law applied to the act of leading a tour of the city, rather than the actual speech of the tour guide.  *Id.* at 463-64.  Additionally, the court stated that when *Reed* held that a law may be content based if it facially distinguishes between

categories of speech defined by their "function or purpose," the court "cannot have meant that

every law restricting conduct also imposes a content-based restriction on speech made in the

course of such conduct." *Id.* at 464. "We cannot accept the view that an apparently limitless

variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends

thereby to express an idea." *Id.* (quoting United States v. O'Brien, 391 U.S. 367, 376, 88 S. Ct.

1673, 20 L.Ed.2d 672 (1968)).  The *Billups* Court stated that the speech required to act as a tour

guide went beyond "function or purpose" and found the City's licensing scheme content neutral.

*Id.*

A similar licensing scheme for city tour guides was upheld in *Kagan v. City of New

Orleans*, 957 F. Supp.2d 774, 778 (E.D. La. 2013).  In that case, the court held the ordinance was

enacted to protect the city's tourism industry by protecting the safety of tour group participants,

reducing the likelihood of tour participants being swindled and that there were no city

restrictions on the content of what a tour guide could say.  *Id.* at 778-79. "And while the

licensing scheme does, in operation, 'refer[] to the content of expression' because it applies only

when persons conduct others for hire and 'giv[e] any type of historical background on certain

sites,' it clearly was not enacted to suppress 'expression due to a disagreement with the message

conveyed or a concern over the message's direct effect on those who are exposed to it.'" *Id.* at

779 (citation omitted).  The County's solicitation ordinance is a reasonable permit scheme that

does not regulate the actual speech involved in any solicitation.  The County solicitor ordinances

do not mandate any form of censorship or other control over the actual content of a solicitor's

speech. See *Josephine Havlak Photographer Inc. v. Village of Twin Oaks,* 884 F.3d 905, 914

(8th Cir. 2017) (regulation that serves purposes unrelated to the content of expression is deemed

neutral, even if it has an incidental effect on some speakers but not others).  When a facially-

neutral restriction is not based on disagreement with the message and is justified without reference to the content of the regulated speech, the court will apply intermediate scrutiny, for purposes of First Amendment challenge to the law. *Id.* at 915.

Chapter 804's solicitation regulations promote public safety by oversight of persons soliciting at St. Louis County's busiest (Schedule I) intersections and limiting the number of persons soliciting there, without regard the content of speech. In sum, the County's solicitation licensing scheme is reasonable because it contains objective standards and does not give unbridled discretion to government officials. *U.S. v. Kistner*, 68 F.3d 218, 221 (8th Cir. 1995).

Alternative Channels

The Plaintiff alleges that the soliciting ordinance is a substantial burden on his First Amendment rights because he can only solicit at designated Schedule I intersections three days a year. An intermediate scrutiny analysis of Chapter 804 requires the ordinance to be narrowly tailored to serve a significant government interest, and "leave open ample alternative channels for communication" for information. *ACORN v. St. Louis County*, 930 F.2d 591, 594 (8th Cir. 1991). There are thirty eight (38) designated Schedule I intersections. *Stip ¶33.* The solicitation ordinance only restricts the Plaintiff's soliciting at these locations. He has unlimited ability to solicit at any other intersection in unincorporated St. Louis County. There are more than two thousand (2,000) intersections that are not restricted and where the Plaintiff can conduct his soliciting. *Joint Stip. ¶24; Schneider aff. ¶¶27-28.* Based on these 2,000 intersections in St. Louis County, Chapter 804 limits the Plaintiff's soliciting at less than 1 percent of intersections in St. Louis County. This leaves ample alternative channels for the Plaintiff to speak to an audience.

The Plaintiff has asserted a claim for malicious prosecution (Count VI) because the

citations written by the police were forwarded to the municipal court. However, malicious prosecution is a tort, which is barred by sovereign immunity as a matter of law. Sovereign immunity "protects governmental entities from tort liability." *State ex rel Alsup v. Kanatzar*, 588 S.W.3d 187, 190 (Mo. banc 2019). It is the rule, rather than the exception. *Metro St. Louis Sewer Dist. v. City of Bellefontaine Neighbors*, 476 S.W. 913, 922 (Mo. banc 2016). Accordingly, "plaintiff must plead with specificity facts demonstrating his claim falls within an exception to sovereign immunity." *Parish v. Novus Equities Co.*, 231 S.W.3d 236, 242 (Mo. App. 2007); Stat ex rel. City of Lee's Summit v. Garrett, 568 S.W.3d 515, 519 (Mo. App. 2019) (accord); see also *State ex rel. City of Kansas City v. Harrell*, 575 S.W.3d 489, 492 (Mo. App. 2019 (to survive dismissal, petition must plead specific facts that, taken as true, establish an exception to the rule of sovereign immunity). The Plaintiff has not pleaded an exception to sovereign immunity.

Further, to state a claim for malicious prosecution under Missouri law, plaintiff must allege the following: (1) the commencement of an earlier suit or prosecution against the plaintiff; (2) the instigation of that suit or prosecution by the defendant; (3) the termination of the prosecution in favor of the plaintiff; (4) the lack of probable cause for the suit or prosecution; (5) that the defendant, in commencing the prosecution, was motivated by malice; and (6) damage to the plaintiff resulting from the suit or prosecution. *Stockley v. Joyce*, 963 F.3d 809, 822 (8th Cir. 2020). "Malicious prosecution actions are not favored in the law as public policy supports uncovering and prosecuting crime. As such, courts require strict compliance with the requisite elements." *Copeland v. Wicks*, 468 S.W.3d 886, 889 (Mo. 2015)

There is no evidence that the Defendant was motivated by malice in beginning the prosecution of the cases against the Plaintiff. It is undisputed that the Plaintiff was cited

numerous times for violations of the challenged County ordinances. *Stip. ¶51.* The bulk of those

cases were nolle prosequi by the County's prosecutor in May of 2019. *Plaintiff's Exh. 30.* The

prosecutor wrote to Hugh Eastwood that the charges were nolle prosequi because Mr. Fernandez

could not afford to pay the fines. *Id.* A nolle prosequi of criminal case against a litigant is not

sufficient to establish termination of an action against litigant, as required to state a claim

for malicious prosecution. *Doyle v. Crane*, 200 S.W.3d 581 (Mo. App. 2006). If a prosecutor

enters a *nolle prosequi* in a criminal prosecution, the plaintiff must show an "accompanying

intent by the prosecutor to finally abandon the prosecution" to establish termination of the

criminal case for the purposes of malicious prosecution. *Id. at 589.* Based on the record, there

was probable cause to cite the Plaintiff under the ordinances and there is no evidence to suggest

that the County acted with malice. *Copeland v. Wicks*, 468 S.W.3d 886 (Mo. 2015); see *Sanders*

*v. Daniel Int'l Corp.*, 682 S.W.2d 803, 813 (Mo. banc 1984) (malice necessary for malicious

prosecution claim means the defendant "must have committed the acts complained of primarily

for the purpose of harming the plaintiff.")

The Plaintiff also claims that his citations and arrests had a chilling effect on his free

speech rights and that his soliciting activity was impacted due to fear of arrests (Count IV). See

*American Civil Liberties of Missouri Foundation v. Lombardi*, 23 F.Supp.3d 1055 (W.D. Mo.

2014) (plaintiff must show that he would like to engage in arguably protected free speech, but is

chilled from doing so by the existence of the statute). The chilling effect claim is belied by

Plaintiff's 64 citations for under the challenged ordinances. *Joint Stip. ¶51.* There is no

evidence of a "chilling effect" on the Plaintiff because he resumed his begging at his favorite

intersection after being cited or arrested. *Id.* Also, there is no evidence that the Plaintiff

acquiesced to the weight of the ordinance or otherwise abandoned the intersection or stopped

begging due to fear of citation. There were also other times when the Plaintiff was not given a citation, but only made to leave the intersection. *Joint Stip. ¶70.* This demonstrates the Plaintiff's lack of fear of any prosecution. Based on his repeated citations and four arrests, he does not appear to have felt any chilling effect of the ordinance sufficient to curb his begging. It is undisputed that the Plaintiff continued to solicit at the intersection of Lindbergh Blvd. and I-55 after repeated enforcement of the soliciting ordinance. *Stip. ¶¶46, 51, 76.*

The Plaintiff also alleges that his rights under the Fourth Amendment were violated due to the arrests (Count IV). The Fourth Amendment protects against unreasonable searches and seizures. Should the court determine that St. Louis County's soliciting ordinances are unconstitutional, the arrest of the Plaintiff under the ordinance does not violate the Fourth Amendment's probable cause standard. *Michigan v. DeFillippo*, 443 U.S. 31, 99 S. Ct. 2627, 61 L. Ed.2d 343 (1979). "Police are charged to enforce laws until and unless they are declared unconstitutional. The enactment of a law forecloses speculation by enforcement officers concerning its constitutionality—with the possible exception of a law so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws. Society would be ill-served if its police officers took it upon themselves to determine which laws are and which are not constitutionally entitled to enforcement." *Id.* at 38.

Damages

The Plaintiff seeks damages for his loss of liberty due to the arrests. It is undisputed that the Plaintiff was jailed for about 28½ hours as a result of four arrests. The Plaintiff has alleged no excessive force when he was arrested and jailed. He alleges that his prior shoulder injury was aggravated when he was handcuffed behind his back during the arrests.

"To establish municipal liability, a plaintiff must first show that one of the municipality's

officers violated [his] federal right." *Veatch v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010) (citation omitted). The requisite degree of fault and casual link between the municipal policy and alleged violation "requires either the existence of a municipal policy that violates federal law on its face or evidence that the municipality has acted with 'deliberate indifference' to an individual's federal rights." *Id.* (citation omitted). "To establish a constitutional violation, no evidence is needed other than a statement of the municipal policy and its exercise." *Szabla v. City of Brooklyn Park*, 486 F.3d 385, 389-90 (8th Cir. 2007) (citation omitted).

Importantly, the Plaintiff does not address the caselaw holding that false arrest and malicious prosecution claims against municipalities are barred by sovereign immunity under Missouri law. See *Warren v. Wentzville*, 2010 WL 3362721 (E.D. Mo. Aug. 25, 2010) (holding that sovereign immunity applies to Plaintiff's claims against the City for malicious prosecution related to the City's "operation and maintenance of its police force, a governmental function:; *Oliver v. Swon*, 2006 WL 2505994 at *5 (citation omitted); see also Wilson v. City of Hazelwood, Mo., 530 F.Supp.2d 1059, 1069 (E.D. Mo. 2007) (plaintiff conceded that his claims for false imprisonment and battery were barred by sovereign immunity). These cases applying sovereign immunity to municipalities appear to be applicable, given that Plaintiff has not pled any exception to Mo.Rev.Stat. §537.600. Additionally, although the plaintiff was not able to solicit while detained, there is no evidence that the plaintiff was otherwise harmed.

Attorney's Fees

Plaintiffs' attorneys seek a total of $139,345 in attorneys' fees for Mr. Schock and Mr. Eastwood. Specifically, Mr. Schock requests $65,435 and Mr. Eastwood is asking for $73,910. That amount is derived from Mr. Schock's stated 113.8 hours on the case and Mr. Eastwood's 153.8 hours. The attorneys state that all of their costs are taxable and that they will submit a bill

of costs at a later date. The attorneys are not seeking an enhanced fee beyond the lodestar amount.

Section 1988(b) of Title 42 U.S. Code provides that in a civil rights action brought under 42 U.S.C. §1983, "the court in its discretion may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." "The purpose of §1988 is to ensure 'effective access to the judicial process' for persons with civil rights grievances" and to encourage citizens to act as "private attorney generals" so that the public interest is advanced by having civil rights laws enforced. *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983); *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402 (1968). "Accordingly, a prevailing plaintiff 'should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust.'" *Hensley*, 461 U.S. at 429 (quoting S. Rep. No. 94-1011, p. 4 (1976) (quoting *Newman*, 390 U.S. at 402) (internal quotations omitted)). The threshold question for the court in deciding a motion for attorney's fees is whether the plaintiff is the "prevailing party." *Farrar v. Hobby*, 506 103, 109 (1992). However, this initial question is determined under a generous standard. A plaintiff is a prevailing party under § 1988 if he succeeds on any significant issue in the case, even if the plaintiff receives only nominal damages. *Id.* at 112.

After finding that plaintiffs have met § 1988's threshold requirement, the next step for the court is to determine what is a reasonable fee. *Hensley,* 461 U.S. at 433. "A reasonable fee is 'one that is adequate to attract competent counsel, but ... [does] not produce windfalls to attorneys." *Blum v. Stenson*, 465 U.S. 886, 897 (1984). The starting point for this determination is the calculation of the "lodestar" amount, which is the product of the number of hours reasonably worked times a reasonable hourly rate. *Hensley*, 461 U.S. at 433. Under the lodestar method, the district court multiplies the number of hours reasonably expended by the relevant

market rate for legal services, then reduces the amount for partial success. *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 565, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986); *Jensen v. Clarke,* 94 F.3d 1191, 1203 (8th Cir.1996). Additionally, the court may undertake various reductions of the claimed fees, based for example, on limited success, an unreasonable hourly rate, excessive hours expended, or poor record keeping. *See Delaware Valley,* 478 U.S. at 565–66, 106 S.Ct. 3088; *McDonald v. Armontrout,* 860 F.2d 1456, 1459 (8th Cir.1988). "It remains the applicant's burden to establish entitlement to a particular award by presenting adequate documentation of its efforts in the litigation." *United Healthcare Corp. v. American Trade Ins. Co., Ltd.,* 88 F. 3d 563, 574 (8th Cir. 1996) (citing *Hensley,* 461 U.S. at 437).

The Eighth Circuit Court of Appeals has instructed that the factors identified in *Johnson v. Ga. Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir.1974), "should be used to set the reasonable number of hours and reasonable hourly rate components of the fee award formula" *McDonald v. Armontrout,* 860 F.2d 1456, 1459 (8th Cir.1988), although district courts need not "examine exhaustively and explicitly, in every case, all of the factors that are relevant to the amount of a fee award," *Griffin v. Jim Jamison, Inc.,* 188 F.3d 996, 997 (8th Cir.1999). The *Johnson* factors are as follows: (1) the time and labor required; (2) the novelty and difficulty of the question; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *McDonald,* 860 F.2d

at 1459 n. 4 (citing *Johnson,* 488 F.2d at 717–19).  Further, the Supreme Court noted that hours may be eliminated for being "excessive" based on a district court's determination that a less amount of time was "reasonable."  *Delaware Valley,* 478 U.S. at n. 2.  Hours are "excessive" when an attorney spends too much time on particular projects. *See Premachandra v. Mitts,* 727 F.2d 717, 733 (8th Cir.1984). The Supreme Court stated that the opinion of a hypothetical fee-paying client reviewing a fee request in the context of a voluntary, open-market relationship, could be used to assess the reasonableness of a fee request.  Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority." *Hensley,* 461 U.S. at 433–34.

The Defendant does not dispute that the Court has already granted a preliminary injunction as to Count III, the vagrancy ordinance.  There are five other counts in the lawsuit that are pending and will determine the ultimate success of the complaint.  The Defendant urges the Court to exercise its discretion not to award the total amount of fees requested.  The County reserves the right to file a response to submittal of invoices by Plaintiff's counsel.

## CONCLUSION

In conclusion, St. Louis County's solicitation ordinance does not burden the Plaintiff's First Amendment rights and is narrowly tailored to achieve a compelling interest because it promotes the public safety of St. Louis County.  The Plaintiff also has not established violations of chilled free speech and malicious prosecution (Counts V and VI).  Based on the foregoing reasons, the Defendant requests that this Court deny the Plaintiff's complaint seeking a permanent injunction against St. Louis County's Chapter 804 (Count I), Section 1209.090 (Count II)  and also Counts IV, V and VI  and for such other relief that this Court deems just and proper.

Respectfully Submitted,


BETH ORWICK
COUNTY COUNSELOR

/s/ Robert C. Moore
Robert C. Moore   #47553
Associate County Counselor
St. Louis County, Missouri
41 S. Central, Ninth Floor
Clayton, MO 63105
(314) 615-7042
(314)615-3732 Fax
rmoore@stlouisco.com
*Attorneys for Defendant St. Louis County, Missouri*


/s/ Linda S. Levin
Linda Suzann Levin 31569 MO
Associate County Counselor
Office of the County Counselor
St. Louis County Government Center
41 S. Central, Ninth Floor
Clayton, MO 63105
(314) 615-7042 tel. (314) 615-3732 fax
LLevin@stlouisco.com

## CERTIFICATE OF SERVICE

I hereby certify that on September 10, 2020, a copy of the foregoing was filed and served via the Court's electronic filing system upon all of the following counsel of record: Hugh A Eastwood Attorney for Plaintiff, 7911 Forsyth Blvd., Suite 300, Clayton, MO. 63105-3825, hugh@eastwoodlawstl.com; W. Bevis Schock, Attorney for Plaintiff, 7777 Bonhomme Avenue, Suite 1300, St. Louis, MO 63105, wbschock@schocklaw.com.

/s/ Robert C. Moore
Robert C. Moore